Good morning, Your Honors, and may it please the Court. This case presents the perfect example of when reassignment was the accommodation of last resort and should have been utilized by the employer to accommodate a disabled worker. By the summer of 2016, it was clear that Mr. Dieng could not return to the rigorous pest control position that he had occupied for seven years. Permanently or temporarily? By the summer, permanently, Your Honor. What is the evidence of that in the record? The evidence of that in the record, Your Honor, is, there's a good deal of evidence, but the most conclusive, first of all, in July of 2016, his doctor says light duty or disabled. In August, Mr. Dieng texts his supervisor, Blake Hunter, to say, my doctor says I can only return to light duty. In October, the employer's workers' comp attorney writes to Mr. Dieng's attorney that Mr. Dieng had reached the maximum medical improvement. So by that point, there's no question. In November, Mr. Dieng writes to Mr. Hunter and says, again, I'm not hearing anything from the company. I can't return to work in the pest control position. I need light duty. And Mr. Hunter responds, I know nothing about light duty. So it's clear that the only way that this employee can be accommodated is through light duty. I'm just trying to think through the timing element. So your position is the July 16 release from the doctor is evidence that he is permanently unable to do the job he had had for a while? It's a clear indication that they need to trigger the interactive process. And there's no response whatsoever by the employer to engage in the interactive process. And as time goes by and it becomes clearer that now we're, you know, by October, we are eight months out on unpaid leave and he still can't return. And the employer is saying to his lawyer, you've got to talk settlement because he's reached maximum medical improvement. Then absolutely there needed to be a discussion. There should have been a discussion from July when his doctor says he needs light duty. They had light duty. And nobody engages with Mr. Jang about it. They had two opportunities for light duty. The easiest is the customer service representative position in which an employee from his very branch in June of 2016 had just vacated that role. They said they were centralizing in Fairfax. But it doesn't, I mean, I appreciate your argument on the lack of response or lack of much response. But I think your client, you mentioned the June situation. There hadn't been a release even for light duty at that point, right? He hadn't, correct, he had not specifically. And he hadn't requested himself the assignment to light duty at that June point. The reason, I'm sorry, go ahead. I apologize. I want to hear your answer. He hadn't done it in writing yet. So his testimony is that he was speaking with Mr. Hunter repeatedly about the option of light duty. But in July his doctor in writing says it has to be light duty. Well, his doctor said, I don't want to quibble too much on this. I think there's an issue of whether being released for light duty is a request by him to do that. That's maybe not that big of a deal. But let's assume, I think, that the start, the request for light duty is either July or August when we have evidence of that. And let's assume, I think, the sales job, which is classified as heavy duty and has requirements that the functional capacity test, says he can't do, is not available. So we're at the customer service position. I tried to figure that spreadsheet out. I found, and one more thing on the hypothetical. Assume, I think, once his lawyer tells Orkin that he's going to agree to a settlement that's going to include termination, that there's no more reasonable duty to transfer you from that point forward. I know you probably contest all that. We do. But just assume those parameters. Within that time frame, I saw three customer service jobs. I forget where they were. Yes, sir. They weren't in his branch. They were three places in like maybe October and November. Did I get that factually right? You got it right, Your Honor. There are, I believe, three customer service rep jobs. One in November, one in December, and I believe there's another one in December or early January. And then Manassas. But the key point, Judge, is that according to them, they were all centralized in Fairfax. So their servicing branches may be somewhere else in Virginia. But all he needs to do is drive 18 miles to Fairfax. Didn't you say that the testimony was they would be consolidated in Fairfax at the end of the year? Mr. Hunter said that it was during the summer that that happened. There's a question of fact on that. Yes. So I do want to say that we do dispute and believe that he could have performed the sales jobs and that that should have gone to a jury. But I certainly agree with you that the easier job is the customer service rep job, where they agree that it was light duty. I'm sorry. Finish your answer. No, I'm sorry. Mr. Hunter testified that Mr. Jang, he saw no reason why Mr. Jang could not have qualified for that job. Mr. Hunter says that he elevated the need for accommodation to human resources and to his boss, the regional vice president, and nobody did anything. And that's Tarquino. That's the problem here. Tarquino illustrates the problem with Orkin. And I'm sorry, Your Honor, I know you want to add another.  Keep going. In Tarquino, it's the employee who doesn't allow the interactive process to get off the ground. I'm not going to share any medical information. I'm not going to let you talk to my doctors. And that was, in that case, the basis for this court to say there's no obligation by the employer to accommodate because the employee didn't let the interactive process work. This case is the opposite. It's the employer who just is, silence, we're not going to engage. You stay home on leave without pay, which is coercive, until you're ready to settle unrelated but not the same legal claims, and you'll resign. And because an accommodation was available, Tarquino makes it clear that if the employer is responsible for sabotaging the interactive process and there was a feasible accommodation that was available, that is a violation of the law. And that's the problem with the way Orkin engaged here. I have a question on the resignation issue. So on the question of resignation and termination, your client voluntarily resigned from the company, was compensated at the time of resignation. So why should we then find that he was, in fact, terminated? He submitted a voluntary resignation. Judge, it's our view that a jury could find that he was constructively discharged by June because the way that the company had him not engaged had just simply ignored him by that point for a year. He's not being paid. He's not hearing anything about how he could get back to work, and he has no work. So it's our view that a jury could find that he was discharged. But if a jury doesn't find that he was discharged by June, we still have a denied accommodation claim that expands over essentially a year from the summer of 2016 until June of 2017 that is still viable. It's just a question of relief, which is exactly how Orkin saw it in their discovery responses, which is if he voluntarily resigned, then there's a cutoff on the back pay that he could obtain in the case. If he was constructively discharged, then full relief is at least in play. And would you please respond to Judge Palabong's question about the impact of the settlement negotiations and whether the obligation to accommodate effectively ended at the time there was an indication that the parties were engaging in settlement? We dispute that for two reasons, Judge. One is factual, and one is legal. First of all, we think the idea that the settlement discussions were part of the accommodation process, that leave without pay was part of the accommodation process, is disputed. Mr. Chang, his attorney in August, August 16th, writes back to the workers' comp lawyer saying he's not interested in settlement. It's not until January, another several months, where he's being told, yeah, you're at maximum medical improvement, but we're not going to talk light duty. It's just talking about settlement. But he says he's not going to talk light duty? I'm sorry, Your Honor. That's correct. He's not told anything. He is told by Mr. Hunter in November, I don't know anything about light duty. That's in writing. But that's all that he's getting. But he's not told there's no light duty available? Correct. Well, he is by Mr. Hunter. But Mr. Hunter says that, you know, I told him there's no light duty available from me, but I also talked to HR, and I never heard back from HR. So, but Mr. Chang's not hearing any of that. He's just at home with the bills piling up and hearing nothing about coming back to work. So it's our view that even when his lawyer says he's willing to entertain settlement discussions, that's not a deal, and it's also not a deal in January when they reach an agreement on money, but the employer is saying he's got to sign a general release, and he doesn't ever sign a general release. And then in March, he goes to the EEOC, and he specifically files his denied accommodation claim, which should have been a clear indication to them that he's not through the workers' comp discussions, contemplating resolving his denied accommodation claim. But can I follow up on that? Yes, of course. I hear your point about October, you know, saying I'm going to engage in settlement. Who knows where it will go, right? I can appreciate there's a question of fact in October. But in January, you know, the lawyer, I know the client ultimately doesn't sign the documents, but there's a clear miscommunication between the lawyer, and it seems that way to me, because the lawyer says we've got a deal. And he doesn't say we've got a deal on money only. We've got a deal, and the deal included the release and the termination. And that's, ORCN, it seems to me, should be able to reasonably rely on someone's agent at that point that they have a deal. Now, that doesn't mean we can sue for breach of settlement agreement, but it seems to me you're saying it's unreasonable for ORCN, once they've been told by your client's lawyer that he's going to agree to terminate his employment, that they should send him somewhere else and start working. That seems unreasonable to me. I understand that, Your Honor, and I appreciate that. I think the problem and the difference is they're not talking about resolving his denied accommodation ADA claims. They're talking about resolving his workers' comp claims. And he is not told, and they don't say in January he's got to resign. Their testimony is, well, Tedesco knew that generally that means that the employee will resign. But he's saying I need a general release, and it's clear, I think you're right. It's not clear in the record, but I think you're right. There was obviously something going on where Mr. Jang was saying I want to pursue my ADA claims. He goes to the Maryland Commission and says before he submits his resignation, he goes to the Maryland Commission and says if I agree to this workers' comp settlement, is it going to tank my ADA claims? And he's told no. So he is operating under the belief that he's settling only his workers' comp claims. But the legal problem, and all of that was related to the factual problem, and I know I'm out of time, Your Honor, but I will wrap this up. The legal problem is the idea that it is in any way accommodating an employee to start talking about settlement discussions about a monetary claim and leave the guy on unpaid leave at home, which as I said earlier is very coercive, is a very dangerous notion under the ADA. Because if that is adopted as permissible, an employer can always say, well, we're in our discretion electing to put you on leave without pay, and then let's talk settlement. At some point an employee is going to be willing to talk settlement. Sure. I hear you. I think that's a fair point. But I just want to go back to what I was asking about a second ago. If we have law about reassignment and how that's like, it's available, but it's disfavored, and a form of accommodation that, as you said in your opening statement, is kind of a rare situation. It seems to me there is a different question of saying, okay, we're going to engage in settlement discussion, and therefore we have no more obligation to accommodate, and saying in the parties reaching agreement that we have a settlement. At that point, and again, the fact that your client may not have been on board with what his lawyer says, I think Orkin had every reason to believe his lawyer, I think. I think even looking at it that way, Your Honor, and I understand the conundrum that the employer might be in, but before that point, they could have accommodated him. Right. I understand that. Before that point, they could have engaged in the interactive process. I understand that. I understand that I've gone over my time, Your Honor. If I could reserve just a few minutes for rebuttal. You may. You may. Mr. Kresslein. Thank you, Your Honor. May it please the Court, and good morning. My name is Charles Kresslein. I'm with Jackson-Lewis here on behalf of the appellee, Orkin. Going through the appellant's position, there's a lot that is said, especially in their brief, about what they feel Orkin could have and should have done. That's not really the issue before this Court. The issue before this Court is, is what Orkin actually did reasonable under the facts and circumstances of this particular case? And the district court absolutely held that it absolutely was reasonable under these circumstances. And what, first of all, let me clarify from, you know, as Your Honor acknowledged before, from the time that Mr. Jiang suffered his injury in February, certainly until July or August, he was deemed completely unable to work. And so there was really nothing for Orkin to do during that window. This is one of the reasons why I, you know, took offense to the assertions in the appellant's briefs, that they just kind of put him out to pasture for 17 months. No, it wasn't 17 months. It was a few months, you know, and the first five or six months, he was deemed totally unable to work. And there was really nothing more that they could do. And then the last five months is when they had an agreement in principle reached on the settlement, when they absolutely weren't going to do anything. Did they really have an agreement in principle? It strikes me that's a question of facts that should go to a jury. They absolutely had an agreement in principle, Your Honor. What does that mean to have an agreement in principle on settlement? Settlement negotiations are certainly not an agreement in principle. It's an agreement to talk. Yes, but as of January the 3rd, they had agreed on all material terms. At what point was the employer told that the plaintiff was interested in light-duty work? Was that in July? It was in July or August. So what happened between July and January? Well. Wasn't there at that point an obligation to engage in an interactive process? They did engage in the interactive process, Your Honor. How did they do so? Mr. Dieng spoke with his manager. And his manager said, I don't know anything. You've got to talk to HR. And he said, I'd like to talk to HR, and HR never reached out. Well, that was later. That was the email that you are referring to now was in November. But there was a dialogue that began in the summer of 2016. He came to his manager, and he presented his light-duty slip. And his light-duty slip is pretty clear about what the restrictions are. And they are very restrictive. I mean, 20-pound lifting restriction, no, you know. Do sales reps need to lift more than 20 pounds? Yes, they do. They do. It's in the job description that they have to lift more than 20 pounds, and they have to lift, I think it was up to 60 pounds, you know, sometimes. And there's also a lot of repetitive bending, stooping. It really has the same level of restrictions as the pest control technicians. I know that Mr. Dieng disagreed with that. He believed that it was less restrictive. But the job description confirms that, no, it was very restrictive. There was a lot of deposition and affidavit testimony that it is extremely restrictive. This is not, that is not. Wasn't there a pregnant employee that was placed on temporary assignment as an accommodation to her request for an accommodation? And wasn't that the position she was placed in? Earlier in the year, yes. There was a short-term pregnancy accommodation where they were able to put that person temporarily in a customer service position for a little while. Doesn't that create a genuine issue of material fact as to whether that accommodation was reasonable under the circumstances? It does not, Your Honor, because by the time, well, first of all, by the time Mr. Dieng was released to return to light duty, that position was no longer, it was no longer in the branch. It had been moved to a central call center in Fairfax, Virginia. And so there was no, you know, when Mr. Dieng presented himself for light duty, it was discussed with his manager. The manager did discuss it with HR. The manager did discuss it with his regional director. So you're suggesting the interactive process is a process that happens internally in the company and not between the worker and the company? It happens between the employee and employer, but that doesn't negate the fact that the employer can't do some, you know, figuring out, can't do some. Well, you should do some figuring out. The question that Judge Vern asked you is should that figuring out also engage the employee? That's the question. Yes, and they did engage the employee. But on this record it said, went to the person and said, well, I reported to them, but I haven't heard from them either. I mean, that's the record. Your argument doesn't really mirror what the record is in terms of any kind of engagement and accommodation. I noticed you slid very quickly to this, once the, when you had the light duty work, the employee who was pregnant, I assume did you still have the weight requirements there, 60 pounds? Should it lift up to 60 pounds? No, no. The 60 pound restriction was in the sales representative position. But the position that, but there was a light duty position that at that point at least didn't require that kind of lifting, right? Correct. At that time there was a customer service position in the branch. And that What's the authority that has to be at the branch? I mean, it seems to me, I understand your argument that you engaged in interactive process. Let's assume we think at least there's a question of fact about that. I know you're not conceding that. But if there's a question of fact about that, it seems like the way for you to prevail, you have to, it has to be, the unpaid leave has to be a sufficient accommodation. And I think you claim that it is, right? Absolutely. And certainly Hannah, you know, gives you some support there. But it only gives you some, it seems, your colleague says there's a question of fact about whether or not the plaintiff was going to be able, at least a question of fact about whether he was permanently disabled from the heavy duty job. And he cited a few things. You heard it a second ago. What's your position on that? Well, most of the things that he cited do not support that proposition at all. What he cited was some e-mails and the July light duty slip, the initial one that said he is released to return light duty, said absolutely nothing about permanency. And, in fact, there's undisputed evidence in the record that both the employer and Mr. Deang believed that he was going to be able to return to work. The question is not whether there's evidence in the record of that. We don't have a defense verdict. The question is whether all the evidence says that. And that's what I'm trying to get at. I think if there's no genuine issue of material fact about whether he was permanently unable to do the heavy duty job, Hannah's a real good case for you. But he's saying there's a question of fact over there, and he listed the lawyer saying he's at maximum medical improvement. He lists the light duty release. It seems like that doesn't really create a question of fact to me. But the maximum medical improvement from Orkin's representative sounds kind of compelling. That e-mail was sent months later in October. So certainly for the period of time up until then, it is undisputed that the parties believed and had every reason to believe that he was going to be able to return to his job. And that's why they just extended his leave in order to give him the time that he needed to recover to seek treatment. And in October ‑‑ But once an individual indicates that they are permanently disabled and unable to return to their job without, even with any accommodation, it seems to me that your argument that it's a reasonable accommodation to place an employee on what is essentially indefinite unpaid leave, places the employee in some kind of purgatory where they can never get out. I mean, it's ‑‑ Well, Hannah held that, yes, it was a ‑‑ Hannah was a situation of an individual where the disability was temporary, and the leave was given to give the employee an opportunity to recover sufficiently to return to their original position, which is the preferred accommodation. Reassignment is an accommodation. It's not the preferred accommodation. But here it was clear that the individual could not return to his job. He was asking for a reassignment of light duty. And rather than that being accommodation, the accommodation allegedly that was found to be reasonable by the district court was unpaid leave. Your Honor, the first indication in the record that it might be that he had reached maximum medical improvement was that October 2016 e‑mail. So certainly up until that time ‑‑ What about July? There was nothing in July except the light duty slip from the doctor, which said nothing about permanency. I think, if I could follow up, and I understand Judge Brunner, she's asking, okay, even if you are expecting him to come back and he's not able to in his own unpaid leave, if he requests light duty, do you not have a legal obligation to explore that? In other words, even if you're thinking, even if we don't even have the stuff in October, you're thinking he's going to come back at some point, but he's not been released to his job. And in the meantime, he wants to get paid. He's got bills to pay. I mean, do you not have an obligation to at least explore the light duty request? They did explore the light duty request. That's not my question. Do you have an obligation to explore it? There is an obligation to explore it, yes. All right. So then, and so you're, and I know you have your position that you all engage the interactive process, but, I mean, there are positions, customer service positions, that were filled between August when he asked for light duty. There's documentation he asked for a light duty job then. And when he's, and let's say January, when he agrees in term, he agrees to a settlement according to you. I mean, at least during that point, there's three customer service positions. Why don't we at least have a question of fact about that? I do not believe that there is evidence in the record that there was. In JA 920, there's a text message between the plaintiff and the Gaithersburg branch manager for Orchid, and the text message says, the doctor said that I can only do light duty work from now on. You told me that once there was no light duty position available for me. Is this still the same? August 18th, 2016. Well, from now on, I do not believe that was an indication that this was a medical evidence of a permanent restriction. And I also do not believe that there's any evidence in the record that there were any openings at that time. But even if there were, again. There's evidence that you filled customer service positions in later on in the year before January. I listed three, and I talked about it with your colleague, and he confirmed that. I mean, do you deny that three customer service positions were filled after August of 2016 and before the settlement was reached? I believe they were all in the November time frame, the ones that you're talking about. Okay. So they wouldn't have been in this time period. He's still requesting. He's requesting light duty later on after August. He didn't stop requesting it. Well, light duty requests normally, when an employee has a doctor's note that says, I'm requesting light duty. It's usually the interactive process is trying to return that employee to his job, you know, with certain light duty restrictions. We're going to take his job responsibilities and cut out the most strenuous things or restructure some stuff so that he can still be productive. The context in which light duty is being discussed by the appellant and now is that, you know, we're not really talking about light duty restrictions to enable him to return to his job because even the appellant conceded that was impossible. The essential functions of his job.   He wants reassignment. Right. But at least, you know, at that time, it was the evidence was that, the undisputed evidence was that the parties believed that he was going to be able to return to work. But he's telling you he wants reassignment. And I asked you a second ago, assume he thinks he's going to be well enough to do the job he had done for a number of years at some point. But in the meantime, he wants reassignment, so he's getting paid. I don't understand. And you told me you have an obligation to explore that. And so it seems like that's a lot of the things that lead us close to a question of fact, at least between August and January. And you say you filled, you know, three, and I think the record shows you filled three light duty customer service positions later on in the year. So at least at some point, those became available. Maybe he was a horrible fit. Maybe it doesn't make any sense at all. But, you know, we don't know anything about that. Well, the fit is relevant to this. That's not your defense, is it? Well, yes, it is in part. Because this goes to the, you know, reassignment as an accommodation of last resort issue. And one of the reasons why reassignment is so disfavored in the courts. You're reading reassignment out of the law altogether. No, I'm not. Under your facts, you're saying the interactive process doesn't apply in the situation of reassignment. It only applies when we try to accommodate an individual into their own, their current position. The district court never got to the question of whether he could actually do those jobs. Even though there was evidence in the record that the positions were available, he identified the positions as his burden to do, and there was not a discussion about whether or not he was the right fit. That may come out in the jury trial. It may come out on remand. But the record below has questions of fact as to whether or not there were, there was even any engagement in the interactive process. Your Honor, during the period of time in which it was believed by both sides that he was going to be able to return to work with some additional leave, it was reasonable for the employer to grant continued leave in order to allow him to do that. That's a position, and you can stick to that. But I thought, you know, when I raised that earlier and then followed up and said, if that, assuming those facts, that they continued to believe he was coming back to work, he makes a request for reassignment because he doesn't want, he'd like to get paid. And you said, I thought you conceded that there's a duty to at least explore that. I said there was a duty to explore, like duty, but I didn't say that there was a duty to explore reassigning him to another job. And as long as, you know, the employer had an accommodation in place, which was the leave, and there was a belief that he was going to return to work, that was reasonable. It was reasonable for them to do that. Now, at the time in October, which was the first indication in the record that he had reached maximum medical improvement, and at that point, you know, Orkin's lawyer reached out to Mr. Dieng's lawyer and said, look, he's at maximum medical improvement. Why don't you make a settlement offer? And he did. And at that point, you know, the parties were engaged in settlement discussions, and even though they hadn't reached a final number and didn't for a number more weeks. Do you find, as a matter of law, that an offer of settlement extinguishes the employer's right to engage in the interactive process under the ADA? What I'm saying is that it was reasonable under these facts and circumstances when the employee. . . In a summary judgment, we're not, there's not, as Judge Quattlebaum pointed out, a defense verdict. So you're asking us to find as a matter of law. . . Yes. That once there's an offer of settlement by an employer, the employer's obligation to engage in the interactive process under the ADA ceases. Jan, it was more than just an offer. It was both parties agreeing to go down the path of settlement. At this point, he had been out on leave for more than a year. Both parties agreeing to go down the path of settlement is less than an offer. That's just an agreement to talk. It's not even an agreement on principle of what the terms of the agreement would be. Yes, but at that point, you know, it is incumbent upon the parties, certainly at this juncture, that if they're going to engage in settlement. . . At this point, the decision was effectively reached, we're going to settle this case. We've still got to hammer out a number, but we're going to settle this case. And they hammered out a number. Chu, did you settle the workers' comp case? I'm sorry? The workers' comp claim, was that settled? Yes, it was. Well, wouldn't he be entitled to those benefits apart from any of this accommodation at all, anyway? I'm sorry. Wouldn't he be entitled to some benefit and settlement in terms of the workers' comp separate from this question here before us? He, you know, he . . . Answer that question, if you would. Wouldn't he? Well, Orkin made it clear that this had to be . . . I know what Orkin said, making it very clear what they were saying or not saying. But the question is, from a legal standpoint, you could be fired and still have workers' compensation claim, couldn't you? You could. Right. But you put it all together with one ball of wax, didn't you? Yes. And in the meantime, he's not paid at all for a whole 17 months. But of course, if we just focus on the five months of pay, so like you're in a sweat box. Like, okay, well, you're not being paid, you've got a workers' comp case. Well, it's a chance to kind of like put it all in one ball of wax and get rid of this. That seems like almost a . . . Your Honor . . . That's more than ahesion. That's almost like . . . He could have said no. Even at that point . . . He could have said . . . No, we're not . . . Excuse me. Sorry. He could have said no, but people have to feed their families. It's hard to say no, isn't it? You have to eat. You have to live somewhere. Or you could have said that way. You could have bibwacked somewhere in the meantime and held out. That's stress, isn't it? On anybody. I understand that his circumstances were tough on him. But that's why they gave him $50,000 in order to, you know, allow him to transition to something else. All right. Unless there are further questions. Thank you very much. Thank you. Mr. Kessler. Solve . . . Solve everything further? Thank you. Just very briefly, Your Honor. Mr. Kresslein said that the company did engage in the interactive process. We took the 30B6 deposition of a company representative with respect to this issue who was asked at Joint Appendix 828, did anyone at Orkin perform a search for vacant positions that Mr. Deng could qualify for in 2016 or 2017 after he was injured? Answer, I'm not able to answer that. Did you ask anybody before today? I did not. Question at 829. Did Orkin engage in the interactive process with Mr. Deng or any representative on his behalf? Answer, I'm not able to answer that question. Did you ask anyone or make any effort to find out before today? I did not. There was no interactive process here. And those are 30B6 . . . 30B6. Counsel, can I . . . are you . . . No, just done with that one. Do you have something else you wanted to make? No, no. Okay. Thank you. I just have a question on a separate issue. Yes. But if you had another rebuttal point, I want to let you get your point. It was just to say that Hannah is very different. In Hannah, the company met with the plaintiff and told him, there are no vacant light-duty positions, but if any become available during the period that you're on unpaid leave, we'll consider you for them. That's very different. The facts are different, for sure. But if you look at the law, because that's where I was going. Yes, sir. I was trying to kind of discuss that a little bit. I hear you that the facts there are different. There's more engagement. What they were trying, the accommodation that was requested, was something that was not really feasible with the type of job at issue. But what we said was that unpaid leave is an acceptable accommodation under the ADA. And then you combine that with our cases on reassignment, which say reassignment is almost a last resort, which may mean last behind unpaid leave. Maybe you disagree with that. And you combine that with the fact that the employer gets to pick among reasonable accommodations. I think HANA is factually different, but its legal principle is kind of tough for you. And now you've got the issue that maybe they knew he was never going to come back, and that might be a way out of HANA. But I'm not so sure just talking about the factual differences in HANA overcome the rule and the implications of it. I appreciate that, Your Honor. And here's what I would say about unpaid leave. I think that this Court has said that unpaid leave can be, can be, a reasonable accommodation in appropriate circumstances. And the appropriate circumstances. Is that what HANA said? Well, it's what Kauffman and Wilson v. Dollar General say, which dealt directly with unpaid leave as an accommodation. Okay. And the point that the Court made is when it's a definitive period of time and it's a short period of time, and there is medical evidence that creates optimism, that the person is soon going to be able to return to the job that everybody wants them in, the original job, which is why reassignment is an accommodation of last resort. We do not quarrel with that. In those circumstances, reassignment, excuse me, leave without pay can be a reasonable accommodation. And we believe that in HANA it's exemplified that it's that because they're meeting, they're talking, and they have reason to believe that he will come back. He did come back within a short period of time. And he was able to resume his work. Their argument is, well, even Mr. Jang says that he thought he'd be able to come back. They're placing a lot of emphasis on that. And if you read that testimony, it's pretty murky. They're asking him first about 2015, when his second injury, and then right after 2016, well, did you think it was permanent? And he says, well, I hoped I'd be able to come back and I'll follow the advice of my doctor. That's very different than by November or December or October him saying, no, I still want to come back. There wasn't any interaction at all. And that's the problem. One last thing for me, at least. There's been a lot of discussion about the interactive process, and I think I understand where it fits in, but I want to make sure. I mean, if legally a reasonable accommodation were offered, whether or not there was an interactive process wouldn't matter, right? I'm sorry. Assume that Orkin has offered a reasonable accommodation. Yes. Another case, another reasonable accommodation, whatever. Yes. Whether they engaged in the interactive process becomes beside the point. I think that's right. Okay. I think that's right. Just to conclude, Your Honors, the whole purpose of this statute is to try to get disabled workers in the economy, being productive members of society, earning a paycheck. This man had seven mouths to feed. He was three months behind in his rent. He couldn't pay his water bills, and no one is talking to him. That was not reasonable. It was error for the district court to say, as a matter of law, that that was good enough. Thank you, Mr. Salzman. Mr. Kresslein as well. I'm okay, but I'm going to take a break. The court is going to take a short recess and we'll come down and brief counsel. This honorable court will take a brief recess.
judges: Roger L. Gregory, A. Marvin Quattlebaum Jr., Nicole G. Berner